IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

WILBERT COLEMAN                                                    PLAINTIFF

v.                                                         No. 4:20CV126-DAS

TIMOTHY MORRIS, ET AL.                                            DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Wilbert Coleman, who

challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison

Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The

plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action

against "[e]very person" who under color of state authority causes the "deprivation of any rights,

privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff

alleges that the defendants failed to protect him from attack by another inmate. The defendants have

moved [71] for summary judgment; the plaintiff has not responded, and the deadline to do so has

expired. For the reasons set forth below, the motion [71] by the defendants for summary judgment

will be granted, and judgment will be entered in favor of the defendants.

## Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other materials" show

that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary

material of record were reduced to admissible evidence in court, it would be insufficient to permit the

nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)).  After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material.  *Anderson*, 477 U.S. at 249.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248.  If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented.  *Celotex*, 477 U.S. at 327.  "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995).  However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998).  In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

## Undisputed Material Facts[1, 2]

Wilbert Coleman, an inmate in the custody of the Mississippi Department of Corrections ("MDOC"), filed suit under 42 U.S.C. § 1983 due to events arising at the Mississippi State Penitentiary ("Parchman") in August 2019. He claims that he was scalded with hot water because of prison officials' deliberate indifference to his need for protection from gang members. Doc. 1 at 5-12 (CM/ECF Pagination). On March 4, 2021, Coleman testified at a *Spears*[3] hearing, clarifying his claims against the Defendants. He sued Warden Lee Simon and Captain Laquitta Meeks in their official capacities.[4] He seeks $100,000 in compensatory damages and requests that Parchman be shut down. Doc. 1 at 12.

Wilbert Coleman has a lengthy and well-documented history of mental health problems exacerbated by ongoing drug abuse. He suffers from paranoid schizophrenia, and his drug abuse has

---

[1]     Defense counsel requested a digital audio file [67] of the *Spears* hearing held on March 4, 2021. Doc. 66. Because it is, at times, unclear what the plaintiff is saying on the recording, counsel was unable to acquire a certified transcript for purposes of this motion. As the *Spears* hearing testimony becomes part of the pleadings, Defense counsel has cited to the uncertified hearing transcript. Given the lack of alternatives, the court will do likewise. *See* Exhibit "A" to the defendants' motion for summary judgment.

[2]     The exhibits referenced in this memorandum opinion may be found attached to the State's response to the defendants' motion for summary judgment.

[3]     *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

[4]     The other remaining defendant, Ms. Simmons (Lieutenant), has not been served. However, as Coleman has also sued this defendant in her official capacity only (as he did the other defendants), the discussion regarding the other defendants applies to Simmons, as well. Where a defending party shows that a plaintiff has no cause of action, the defense also benefits an unserved or defaulting defendant. *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001).

- 3 -

led to many violent incidents and impeded mental healthcare providers' ability to treat him.[5]  His records confirm that he engaged in self-harm and attempted suicide as he alleges in his complaint.[6]

Coleman was incarcerated in MDOC custody in February 2015. Exh. "B," *Institutional Record* at MDOC-COLEMAN 126-0016595.  In August 2018, he was transferred to the Mississippi State Penitentiary in Parchman, Mississippi ("Parchman") and housed in Unit 29, where he began to have conflicts with members of the Vice Lords.  *Id*. at MDOC-COLEMAN 126-001734 – 1735.  In September of 2018, Coleman was moved several times to different buildings in Unit 29 and eventually placed in "open protective custody" after reporting that he was assaulted in F Building because of his sexuality.  Exh. B, *Institutional Record*, at MDOC-COLEMAN 126-001708 – 1709, 1718.  He remained in open protective custody until November 9, 2018, when he was moved to short term segregation after he and another inmate stabbed a correctional officer multiple times with a shank.  *Id*. at MDOC-COLEMAN 126-001718 – 1720.  Coleman was then approved for "close confinement" status and placed in long term segregation ("LTS") on January 25, 2019, because he had assaulted the officer.  *Id*. at 27.  He was housed in close confinement under close custody status during the events giving rise to this action.

According to Coleman, he began receiving threats in April 2019, after Offender Raymone Gutta, a Vice Lord, told fellow gang members that Coleman "shook [his] penis" at him during a "bar fight" (an argument between offenders who are separated by cell bars.)  Doc. 1 at 6; *see also* Exh. A, *Uncertified Spears Hearing Transcript* at 4:20 – 5:14.  In April 2019, Coleman was housed in Unit 29,

---

[5]    *See* Exh. B, *"Drill Down Detail Report"* at MDOC-COLEMAN 126-001703—1710; Exh. C, *Medical Record Excerpts* at MDOC-COLEMAN 126-000128.

[6]    *See* Exh. B, "Incident Report" at MDOC-COLEMAN 126-001740; Exh. "C," *Medical Record Excerpts*, at MDOC-COLEMAN 126-000117—153.

A Building. Exh. B, *Institutional Record* at MDOC-COLEMAN 126-001735. According to

Coleman, he asked his mother to assist him in getting Gutta red tagged but was unsuccessful. Doc. 1

at 6.

Coleman claims that two weeks after his argument with Gutta, he had problems with other

gang members in the zone. He states that another inmate informed the Vice Lords that he was a snitch

after Coleman told a prison captain that the other inmate possessed contraband on that zone. Doc. 1 at

6. Coleman claims that one inmate held an officer at knifepoint after he was paid to get the keys to

Coleman's cell. *Id*. at 6-7. There were no reports of this incident or of any threats from gang

members in Coleman's institutional record during that period. Other than his request to be housed in

the close custody zone with the offender who assisted him in the violent assault of the correctional

officer, Coleman made no complaints or additional requests to be moved in April 2019. *See* Exh. B,

*Institutional Record*, at MDOC-COLEMAN 126-001723.

Coleman was moved to L Building on May 1, 2019. Exh. B, *Institutional Record* at MDOC-

COLEMAN-126-001735. He had no red tags in L Building (meaning that no offenders in that

building were on Coleman's list of inmates to house separately from him – or vice versa). *Id*. at

MDOC-COLEMAN-126-001724. Coleman states in his complaint that he was not threatened after

his placement in L Building until two months later, in July 2019, when he was recognized by an

inmate who had moved there from A Building. Doc. 1 at 7. Coleman alleges that this inmate tipped

off the Vice Lords about his location. *Id*.

Coleman also alleges that he was continually threatened by Vice Lords over the next several

months – and that he repeatedly asked to be moved or placed in protective custody for fear of his

safety. *Id*. at 7 – 8. He alleges that he attempted suicide more than once as a means of getting

assistance because his requests to be moved were ignored. *Id*. at 8. His records show that he was

placed on suicide observation in Unit 42, South Ward on June 7, 2019, after he made a symbolic suicide attempt by tying a string around his neck. Exh. B, *Institutional Record*, at MDOC-COLEMAN 126-001705, 1740. On June 9, 2019 and June 23, 2019, Coleman informed mental health providers at Parchman of his security issues with the Vice Lords. He told them that the gang had put out a hit on him. Exh. C, *Medical Record Excerpts*, at MDOC-COLEMAN 126-000730, 126-000775. The infirmary progress notes reflect that this information was provided to investigators with Corrections Investigation Division ("CID"). *Id.* Coleman reported that he had attempted suicide because he feared for his life at the hands of the Vice Lords. Exh. C, *Medical Record Excerpts*, at MDOC-COLEMAN 126-000730, 126-000775, 126-000789.

He was discharged from the infirmary and moved back to close confinement, long term segregation in L Building on June 24, 2019. Exh. C, *Medical Record Excerpts*, at MDOC-COLEMAN 126-000779 – 783; Exh. B, *Institutional Record*, at MDOC-COLEMAN 126-001735. The next day, Defendant Lee Simon received a call from someone who identified herself as Brenda Fountain. Ms. Fountain told Simon that Coleman had called her and said that another offender had cut Coleman with a knife. Defendant Meeks conducted a wellness check on Coleman, and, when she arrived, he was talking on the telephone. When Meeks spoke to him, she did not observe any cuts on his body or anything around his neck. Exh. B, *Institutional Record*, at MDOC-COLEMAN 126-001724.

Coleman was placed back under psychiatric observation after he attempted suicide again on July 5, 2019. Exh. B, *Institutional Record*, at MDOC-COLEMAN 126-001735; Exh. C, *Medical Record Excerpts*, at MDOC-COLEMAN 126-000788 – 789. He was medically discharged from suicide watch in Unit 42 on July 11, 2019. He remained housed in segregation in Unit 29, L Building under close custody status.

On August 12, 2019, Coleman threw urine on an officer who was escorting a nurse during a medication call. Exh. B, *Institutional Record* at MDOC-COLEMAN 126-001705, 1740. He was placed in Restricted Mobility Restraints in his cell. *Id.* The next day, Offender Henry Johnson, inmate #110319, threw hot water on Coleman while he was restrained in B zone in Unit 29, L Building. *Id.* Coleman was transported by ambulance to Merit Health Central Hospital, where he was treated for second degree burns on his head, neck, right side of his face, right shoulder and upper arm, and chest. Exh. C, *Medical Record Excerpts*, at MDOC-COLEMAN 126-000837 – 847. When interviewed, Johnson stated that he had scalded Coleman with hot water because he had thrown urine on the female officer. Exh. B, *Institutional Record*, at 126-001740.

### Eleventh Amendment Immunity

Wilbert Coleman has sued the defendants in their official capacities only. They will therefore be dismissed from this suit, as the Eleventh Amendment prohibits actions against a state actor without the state's consent. *Brooks v. George County, Mississippi*, 84 F.3d 157, 168 (5th Cir. 1996). The principle of sovereign immunity is reflected in the Eleventh Amendment, which precludes suits brought by private citizens against states in federal court unless the State has waived its immunity. U.S. Const. amend. XI; *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). Congress did not abrogate Eleventh Amendment immunity in enacting § 1983, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and Mississippi has not waived sovereign immunity, Miss. Code. Ann. § 11-46-5(4).

MDOC is an arm of the State of Mississippi and cloaked with the State's Eleventh Amendment immunity from suit. *See Williams v. Mississippi Dep't of Corr.*, No. 3:12CV259-CWR-FKB, 2012 WL 2052101, at *1–2 (S.D. Miss. June 6, 2012); *Dandridge v. Mississippi*, No. CIV.A 208CV229KSMTP, 2009 WL 4940105 (S.D. Miss. Dec. 14, 2009). As MDOC is an arm of the state,

its officers and employees, in their official capacities, are officers of the state. They are entitled to sovereign immunity from monetary damages in their official capacities. *See Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 921 (5th Cir. 1993) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)) ("a suit against a state official in his or her official capacity … is no different from a suit against the State itself.") Defendants Simon and Meeks are therefore entitled to summary judgment as they have sovereign immunity from Coleman's monetary damage claims against them in their official capacities.

A single exception to Eleventh Amendment immunity exists for suits against state officials in their official capacities for prospective injunctive relief only: A state official may be sued in his official capacity for prospective injunctive relief. *Ex parte Young*, 209 U.S. 123, 159–160 (1908). "This exception strips the individual state actor of immunity and allows a private citizen to sue that individual in federal court for prospective injunctive relief based on allegations that the actor violated federal law." *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011). A state official may be sued in his or her official capacity for injunctive relief under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 (1985), n. 14 (1985) (citing *Ex parte Young*, 209 U.S. at 159–160). In order to use the *Ex parte Young* exception, a complaint must allege that defendants are *currently* violating federal law, not simply that they have done so in the past. *See Green v. Mansour*, 474 U.S. 64, 71–73 (1985).

Coleman has requested injunctive relief: that Parchman be shut down entirely. Doc. 1 at 12. First, Coleman's transfer to another facility appears renders his claim for injunctive relief moot.[7]

---

[7] He was transferred to Central Mississippi Correctional Facility ("CMCF") on August 15, 2019 (after the incident at issue took place), then to East Mississippi Correctional Facility ("EMCF") in June of 2021, where he is currently housed. *See* Exh. B, *Institutional Record* at MDOC-COLEMAN 126-001735.

*Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). In addition, as discussed below, he is no longer incarcerated at Parchman; hence, there is no ongoing violation of federal law by the defendants requiring prospective relief.

**Defendants, in Their Official Capacities, Are Not Persons Under § 1983.**

The plaintiff's claims are also precluded because the defendants are not "persons" under § 1983, which provides, in relevant part:

> Every *person* who, under color [state law] … subjects … any … person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ….

42 U.S.C. § 1983 (emphasis added). Generally, a defendant is liable under § 1983 when a plaintiff shows that an official (1) acted "under color of" law, and (2) the official's actions deprived the plaintiff of some right, privilege, or immunity secured by the Constitution or federal law. *Monroe v. Pape*, 365 U.S. 167, 171 (1961); *James v. Texas Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). However, the State, arms of the State, and state officials sued in their official capacities are not "persons" under § 1983. *See Will*, 491 U.S. at 71. Under the Supreme Court's holding in *Will,* the defendants (in their official capacities) are not "persons" under § 1983 and thus are not amenable to suit. The plaintiff's claims against the defendants must be dismissed.

**Defendants in Their Individual Capacities
Are Cloaked With Qualified Immunity**

Though Coleman sued the defendants in their official capacities only, they would enjoy qualified immunity had he also sued them in their individual capacities. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727,

73 L.Ed.2d 396 (1982). To overcome the qualified immunity defense, a plaintiff must meet a two-pronged test. He must first allege a violation of a clearly established constitutional right. *Wilkerson v. Stalder*, 329 F.3d 431, 434 (5th Cir. 2003); *Heitschmidt v. City of Houston*, 161 F.3d 834, 836–37 (5th Cir.1998). "To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In addition to alleging the violation of a clearly established constitutional right, a plaintiff must also allege facts showing that the defendant's conduct was objectively unreasonable in the light of the law established at the time of the incident. *Heitschmidt*, 161 F.3d at 836–37. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Coleman alleges that the Vice Lords threatened him for several months – and that he repeatedly asked to be moved or placed in protective custody to prevent an attack. Doc. 1 at 7-8. He alleges that the defendants ignored his requests, causing him to make multiple attempts on his life to get help – and led finally to the attack where he was scalded with hot water. *Id*. at 8. He thus claims that the defendants failed to protect him from attack by another inmate. "The Eighth Amendment affords prisoners protection against injury at the hands of other inmates." *Johnson v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986) (citations omitted). Deliberate indifference "[is] the proper standard to apply in the context of convicted prisoners who claim[] … the failure to protect." *Grabowski v. Jackson County Public Defenders Office*, 47 F.3d 1386, 1396 (5th Cir. 1995). A prisoner plaintiff cannot show that a prison official showed deliberate indifference unless he can show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety;" indeed, the official must

have been aware of facts giving rise to an inference that a substantial risk of serious harm existed – and he must have drawn that inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

An inmate pursuing a claim for failure to protect may prove his claim by showing that the defendants knew of a specific threat to him but failed to take measures to protect him from it. *Id.* at 843. However, even in the absence of specific threat, an inmate may prove a claim of failure to protect if he can show that he was placed in a prison environment "where terror reigns." *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981), overruled on other grounds by *International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986). This situation arises in a jail or prison where officials permit violent offenders to hold sway over part or all of the facility – creating "a pervasive risk of harm and a failure to take reasonable steps to prevent the known risk." *Stokes v. Delcambre,* 710 F.2d 1120 (5th Cir. 1983) (sheriff housed college students arrested on a non-violent misdemeanor charge with a dozen inmates charged with violent felonies – leading to the students' severe beating and rape). Indeed, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Coleman has provided no evidence to show that defendants Simon and Meeks were deliberately indifferent to his requests for protection. He alleges that, after he received threats for shaking his penis at a Vice Lord, prison officials did not "red tag" the offender. He states in his complaint that he had his mother call the facility to get red tags on the Vice Lord, but prison officials never addressed his request. Doc. 1 at 6. Coleman stated, however, that he did not know the Vice Lords' names at the time. Staff cannot place a red tag in Coleman's file without the name or number of the inmate from whom he wants to keep separate.

- 11 -

The record also contradicts Colemans allegations that prison officials repeatedly ignored his requests to be moved. His institutional record shows that he spent most of his time at Parchman housed under psychiatric observation as a suicide precaution or in close-custody segregation due to his stabbing of a correctional officer.[8] As noted above, Coleman has a history of significant mental health problems complicated by drug abuse.[9] His records confirm that he harmed himself and attempted suicide as described in his complaint.[10] The records show that prison staff did not ignore his requests to be moved, as he has been moved many times during his incarceration at Parchman.[11] Indeed, Coleman admits that he was moved immediately when prison officials, including Warden Simon, learned of a security threat to him. Doc. 1 at 7. Exh. A, *Spears Hearing transcript*, at 5:15—9:10. Coleman also admits in his complaint that after Vice Lords made threats against him to Captain Manfred, he was immediately told to pack up, and he moved to a different zone (Unit 29, L Building). Doc. 1 at 7. Coleman, however, stated that, despite these threats, he did not want to be moved at that time. Exh. A, Uncertified *Spears Hearing transcript* at 9:22 – 10:13; Doc. 1 at 7.

Similarly, there is no evidence that the defendants disregarded a serious risk to his safety in failing to protect him from the offender who scalded him. Coleman reported that the Vice Lords became angry with him when a gang member, Raymone Gutta, accused Coleman of shaking his penis at him. There is no evidence that offender Henry Johnson (the inmate who scalded Coleman) is a Vice

---

[8]    *See* Exh. B, "Drill Down Detail Report" at MDOC-COLEMAN 126-001709; "Classification History" at 126-001732; "Incident Report" at 001739.

[9]    *See* Exh. B, *"Drill Down Detail Report"* at MDOC-COLEMAN 126-001703—1710; Exh. C, *Medical Record Excerpts* at MDOC-COLEMAN 126-000128.

[10]    *See* Exh. B, "Incident Report" at MDOC-COLEMAN 126-001740; Exh. "C," *Medical Record Excerpts*, at MDOC-COLEMAN 126-000117—153.

[11]    *See* Exh. B, Institutional Record, at MDOC-COLEMAN 126-001718; "Housing History" at MDOC-COLEMAN 126-001734—35.

Lord.  Further, it appears that Johnson's August 13 attack had nothing to do with Coleman's act, months earlier (back in April), of shaking his penis at Gutta.  When interviewed, Johnson told Correctional Supervisor Juanita Simmons and defendant Laquitta Meeks that he assaulted Coleman, not because of the April penis-shaking incident – but because Coleman had thrown urine on an officer the day before – on August 12, 2019.  Exh. B, *Institutional Record,* at 126-001740.  Johnson threw scalding water on Coleman only a day after he had thrown urine on the female officer.  Exh. B, *Institutional Record* at MDOC-COLEMAN 126-001705, 1740.

Coleman has not alleged that the defendants knew that Johnson posed any danger to him. Johnson was not on Coleman's "red tag" list.  See Exh. B, Institutional Record, at MDOC-COLEMAN 126-001742—44.  Nor was Coleman listed on Johnson's "keep separate" list.  See Exh. D, Institutional Record of Offender Henry Johnson, #110319, at MDOC-COLEMAN 126-001889. Indeed, Coleman's inmate file contains no incident with Johnson before the assault with hot water. The two were never housed in the same building before May 1, 2019, when Coleman was moved to L Building.  Hence, there is no evidence that the defendants knew that Johnson posed any threat to Coleman, nor could they have anticipated that Johnson would scald him with hot water in retaliation for throwing urine on a female officer.  Coleman "has not provided facts indicating that the defendants were informed of a prior altercation between [him] and the other inmate or of [his] wish to be moved away from the other inmate[;] nor has he shown that the prior altercation posed a 'substantial risk of serious harm[;]' [as such,] he has failed to show that the defendants acted with deliberate indifference."  *Peyton v. Rucker*, 101 F. App'x 982, 983 (5th Cir. 2004) (citing *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) (quoting *Farmer*, 511 U.S. at 837)).

Neither defendant Simon nor defendant Meeks was present when the scalding incident took place.  Coleman claims that his mother called and told Simon that he was being threatened by gang

members and he feared for his safety, but she refused to move him to a different zone. Doc. 1 at 7. After Warden Simon received a call about Coleman's safety, defendant Meeks was dispatched to his housing unit to check on him. Meeks confirmed that he was safe, using a phone, and had no injuries. Exh. B, Institutional Record at MDOC-COLEMAN 126-001724. This also negates Coleman's claim that the defendants prevented him from using the phone to contact his mother. In addition, the plaintiff acknowledges that Warden Simon warned the guards in that zone to be on alert because she had received word that inmates were trying to do something to him. Doc. 1 at 7 - 8. Though Simon did not immediately order that Coleman be moved, a prison official's response to an inmate's complaints "by referring the matter for further investigation" or taking other appropriate administrative action fulfills the official's protective duties under the Eighth Amendment. *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) (quoting *Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004)).

Wilbert Coleman has stated no facts to establish that the defendants failed to act despite knowledge that he faced a substantial risk of serious harm. As he has alleged no facts to establish that the defendants could have anticipated the scalding attack, he has not shown that they acted with deliberate indifference in failing to protect him from that assault – an incident wholly unrelated to the threats he had received months prior to the incident. As such, their actions in this case were objectively reasonable, and they are entitled to qualified immunity.

### Conclusion

For the reasons set forth above, the defendants' motion for summary judgment will be granted. The defendants are entitled to Eleventh Amendment immunity and, in the alternative, qualified immunity. In addition, they are not "persons" under 42 U.S.C. § 1983 and are not amendable to suit.

As such, judgment will be entered in favor of the defendants in all respects. A final judgment consistent with this memorandum opinion will issue today.

      **SO ORDERED**, this, the 26th day of September, 2022.

/s/ David A. Sanders
DAVID A. SANDERS
UNITED STATES MAGISTRATE JUDGE